All rise for the second session of the Legislative Supportive Providing Committee. I think you all know the drill that you're allowed 15 minutes per side and the appellant can reserve any time from those 15 minutes for rebuttal. I think if you've had experience with our particular panel, you know that we're not going to necessarily enforce those time deadlines with rigor if we still have unanswered questions and issues that would benefit from some additional time. We don't hesitate to give it to you, but don't assume that it's yours to necessarily waste or unnecessarily use up. At any rate, with that in mind, we'll call the remaining case on our docket this morning. Case number 09-2058, People v. Donald Turner. Would the attorneys first, both of you step up and identify yourselves for the record. Then the one who's going to argue will remain while the other is seated. Good morning. My name is Caroline Borland and I represent the appellant Donald Turner. Good morning, Mary Borland, on behalf of the people. Thank you. You may proceed when ready. Good morning again, your honors and counsel. May it please the court, in this case, the common law record and the transcripts tell two different stories about this trial. In the common law record, there is evidence concerning the credibility of the testimony given at this trial, as well as a suggestive lineup photo identification. Why don't we specify what the impeachment value of this record that we don't see really consists of. You may do that after you bring out the second manifestation of this case in our records. Okay. So are you concerning what is the actual impeachment evidence we're relying on? So that if we're arguing, we know that it has a meaningful, that it makes a meaningful difference in the outcome, as opposed to simply a theoretical one or one that involves propriety of conduct of each of the sides in this case. Okay. This actual record was a DCFS file concerning an investigation by DCFS into these complaints that was tendered to defense counsel on January 5th, 2009. And it was tendered presumably to the Abused and Neglected Child Reporting Act. And it is deployed or referred to by the, by your client in support of the contention that there was ineffective assistance of counsel. Correct. It's not under scrutiny for any other purpose but that. Correct. Okay. We're trying to stand on that. So in order to understand or to determine whether there would be ineffective assistance of counsel, you don't dispute the two prongs of Strickland, that you have to show, first of all, that there was less than reasonable representation generally in the case and that the particular omission or error, if there was, was outcome determinative. Sure. And I'm really concerned about the second prong at this point more so than the earlier one, although I'm not by any means attempting to denigrate the significance of either prong in this discussion. So I can begin to explain how these errors then perhaps prejudice the outcome of the trial, if Your Honor would like. Yes. And I guess I'll highlight three of them, and the first one would be the prior inconsistent statement that we have alleged. At trial, U.S. testified that the events, the relationship between her and Mr. Turner concerned, or continued after the charged events.           In January. In January. In January. In January. In January. In January. In January. In January. In January. In January. In January. In January. In January.  In January 5th. Yes. January 2nd or 3rd, I think. In the hotel room. In a specific hotel. Yes. And the DCFS report showed that on January 9th, when speaking to the DCFS investigation committee... There was an omission of that fact. Yes. So it would have best be impeachment by omission in a context that you would assert to be one where it would be reasonable to expect that there would have been affirmative disclosure of that incident. Yes. Okay. What else? And I believe that the fact she told a different story to that investigator at the time cast doubt on the credibility of her trial, and had defense counsel been successful in impeaching this different story, the court would have been... Now how is that admissible, that impeachment, if the cases, including Holmes and various other decisions, tell us that past untruthfulness is not relevant in the absence, certainly not relevant to replace reputation as a testimony as to credibility, but is only relevant to the extent that it establishes other material facts other than simply the character of the witness insofar as pertains to his truth-telling practices? Well, a witness's prior inconsistent statement is relevant to... Now I'm not talking about the first. I'm talking about the second. The prior false confession? Yes. Okay. The prior false complaint. Well, on this end, we know that defense counsel didn't even ask for this. Well, what would have been admissible about that had he asked? If he had, under Cookson, if the evidence had shown that it was truthful, or if there was actual basis behind the falsity of that, if it was relevant to her motive to implicate Mr. Turner. Well, how, and let's say motive could be one material issue for which it could be used if it were there to actually further the inference as to that element. But what motive does her previous false complaint, if you want to call it that, since the falsity would only have been testified to by one particular witness, and what, how would that indicate a motivation here as opposed to a penchant or a character loss? I think it's relevant to when she made her outcry against Mr. Turner, having known that she had made a complaint in the past that had been proven to be false, she would be motivated to not raise some sort of similar activity. Again, I guess it's relevant to consider at the time she made that, she was in great trouble with her foster mother.  There's no consent available, is there? I'm not sure if the defense of consent... Wasn't she 14 at the time? Oh, right, the defense is not available to this charge. Right, so in this particular case, you have a 14-year-old, and then you have like, how many other people actually either saw or corroborated in some way that a sexual encounter took place in that room? There were three foster siblings who saw the events on that night, and then her foster mother was involved in kind of the outcry. But she didn't, but that particular evening, the foster mother wasn't disturbed, I thought, because the older foster child said that the foster mother had some health things going on and she'd been cooking all day or whatever, but so there were three other individuals. Yes, and one of those individuals was BT, the younger niece of the foster mother, and this is kind of relevant to the fact that she was also in the room. So what I'm getting at here is this. Is there anything in the record that really even suggests that there was a false complaint, other than someone else who wouldn't have personal knowledge saying that this person made a false complaint before? Not in this record. So how do you get that before us to show that this was ineffective when you don't have anything in the record to actually support competent evidence to establish that there was, in fact, a false complaint? Don't we need that first to show that the lawyer was ineffective? In order to show that, don't we have to show that there was actually a false complaint? I don't think so in this case because this particular deficiency is a failure to investigate, a failure to ask the trial court, but it's part of a pattern of neglect that we can see in this case where defense counsel did not use an available prior inconsistent statement that we know he had, where defense counsel was not challenging the lawyer. But how do you show prejudice if you cannot even show in the first instance that there was some merit to this claim of a false complaint that comes from another party that has no actual knowledge? I mean, I don't know how you can say, number one, that this was not only unreasonable trial strategy, but also that there was prejudice when you don't really have even a threshold to show that there actually was a false complaint. I think it has to be looked at cumulatively, would be my answer. Does it undermine, and it does undermine competence. Well, I don't see how it becomes admissible under the Clarkson decision at all so far because I don't see how motive is inferred against the defendant here by virtue of her complaint, even if it were established that she had made one against someone else, evidently more of a peer in that case, someone of her own age or generation, other than to show that she's a lawyer. And that's precisely what is not admissible, except her reputation. I think we do know, I mean, even generally, assuming what we know about this evidence, I think, given that she was in the room at the time she made this outcry with someone who had witnessed a sexual encounter with her about two weeks before, and she was in trouble, that at that point she would be thinking about, what can I do to get out of trouble? And she would know that she couldn't claim to be unwilling again, if we assume. But also, I think that we have to- Well, that's pretty remote, isn't it? That's kind of picking at straws, isn't it? I think, though, it's also been, had there been a hearing to know what this specific complaint was about, it may have showed more relevance. It may have revealed, I don't know that it's clear that it was- Well, I don't know that you've really established that a failure on the part of an attorney to investigate a possible source of impeachment is in the same category as a failure to interview a witness, for example, which is more along the classical lines of an effective assistance if it's presumably an occurrence witness. Does an attorney, is an attorney obligated to pursue every rumor or every bit of potential data that might conceivably, but not with any degree of probability, have any fertile, productive function in asserting the defense? In this case where the theory was a false complaint, I do think defense counsel should- When there's case, a Supreme Court case law that says specifically that past complaints are not admissible as a general rule, and you have to look to the so-called metaphorically defined print to see under what circumstances it may be admissible. Well, then I can move on to our other players, and specifically how they did prejudice Mr. Strickland, and how we can establish that prejudice, and we've already talked about the prior inconsistent statement, and in context of how it would have affected U.S.'s credibility, I think that the court would have been required in seeing that she told a different story so close in time to these events to more scrutiny, carefully scrutinize her testimony about what she said happened between- Well, how about the eyewitnesses in this case? Would it have made a difference in the outcome? Because that is the second Strickland prong, and in this case, it's not hanging on her testimony when she had one roommate who hid under a bed, and another that saw her, and a third one as well. How do you plan to- How would you establish prejudice under the second Strickland prong? By looking closely at those identifications, and also considering how Defense Counsel failed to properly test, and I guess first to put those identifications in context, if you look only at the trial identifications, they all occurred three years after these events, and these were people who cared very much so- What were the original identifications? Let's go through those. The only original identification we know of would be the out-of-court identification from A.T., which was in November of 2007. Was that the one who saw him in the school before? No, she was- There was one witness who knew him, at least who recognized him, as being a teacher at the school, or someone that she had met in the school before? That's B.T. She was the one who was- Okay, and doesn't that fortify her identification- I think- Based on past familiarity, because it was different parts of the brain to associate of memory in the first instance where she's already seen him, as opposed to a first exposure recollection? Well then, if it's true that she had recognized him at that time, then why did she not tell when Darlene Morrow rounded up everyone after these events to try to understand what was going on? She didn't say that she understood, that she knew who this person was. The first time we- the record shows her coming forward is at trial when she points. And again, she is someone who cares about U.S., and I think these witnesses may have been able to point at Mr. Turner at trial because U.S. had told them that this was the man in the room, whether or not they had seen that- Is there any evidence though of that in the record now, what you're saying? Given that we don't have any other prior identifications at this point, and given their age, you're not really basing this on the record? I am. I am basing it on the fact that in human experience that they hadn't- like under the Biggers factors, you consider the length of time from identifications to the events as part of their liability. Who viewed the photo array? Which one of the witnesses? A.T. did. Okay, and what is the- V.T., how did she identify him? The only one we know of is at trial. Okay, but A.T. viewed a photo array? Yes, in November of 2007, which would have been almost- And you're critical of the fillings in that, correct? Yes. That was- the photo array is the same as the lineup picture? Yes. And then what about Darlene? Darlene was trial only as well. And who identified him as a boy as opposed to a man? That was A.T. And wasn't- didn't that identification take place in a dark room? Because I thought I read that the lights were out at the time. I think they turned on the light when Darlene came up, and then they escorted him out, so- When she saw him, did she have any reason to think that it would be a man as opposed to a boy? No. I mean, she said- So where is the impeachment of her testimony, which I think you're implying, based on that? From the fact that she did not tell the foster mother what was going on. But not on the basis that she mischaracterized him as a boy rather than as a man. Since she had no vision, so to speak, other than shadows, basically. Isn't that right? Well, no, because she did walk him, escort him out of the house. So she had seen- But her statement that it was a boy was based on what she saw while the room was dark. No. Both A.T. and Darlene- She kept calling him boy afterwards. The entire- A.T. referenced him as a boy her entire testimony. Darlene would reference him as a guy through her entire testimony. And Darlene, who lived on her own and was just home visiting, did not tell the foster mother that there had been an adult man in the room. And I think it's a- Her testimony is reasonable that she wouldn't do- That's a reasonable inference if it was someone closer to U.S.'s own age. Maybe she doesn't want to upset her foster mother. But it's unreasonable, in our opinion, to believe that she wouldn't tell the foster mother that an adult male was in the room of a 14-year-old in her very own house on Christmas Eve. So her actions conflict with- But didn't she say why she didn't tell her? It was because she was ill. Yeah. And I think that's- Again, I think that does make sense if it's- Did the arrest take place subsequent- I mean, wasn't it- When did the arrest take place? September of 07, I believe. It was a few weeks before the identification of AT. But January of 07 was the- December of 06, then, was the incident- December of 05. The offense. 05? Uh-huh. And the DCFS investigation- Oh, that's right. Okay. It was that lengthy DCFS. All right. All right. Okay. And if you consider those identifications, which I do think they were weak and the court should scrutinize them, they did gain this significant amount of credibility when you have testimony of that AT was not with US when she was identifying him to the police officers. And there was further corroboration, or at least an inference that her identification would have been reliable because she was the one who did not go to school with Mr. Turner. So when that identification came in at trial, it sort of forced or allowed not as close scrutiny of the time of these identifications and of the fact that these witnesses were so close to AT. Are you still urging some ineffective assistance on the basis that she didn't call Jackson? I believe that's more of a failure to- Yes. I mean, he would have had to hold probably a hearing to establish if there was expert testimony. Of course, Jackson did not represent herself as an expert in determining syndromes that would impact on credibility because you simply can't have a witness testify to believability, although the law has expanded where you can have testimony as to certain psychological conditions that are such as certainly the prime one being under narcotics, an addict who will have- Factors are impeachable. But she didn't represent herself as having any of those qualifications. She was what, a social worker? Yes. And the basic point- And you would have learned of her through this DCFS- And we know that defense counsel did know her name. And I guess the issue that as part of this pattern of neglect that we're arguing- Now, at some point, I think we would be making a response to the state's charge that you were making inappropriate, if not illegal, usage of some of this data. But I think if my panel concurs, we could give you some time and rebuttal so that you can hear from the state first on that charge before you challenge it on your own. It'll be your choice. I'm ready to talk about it now? Well, if you want to talk about it now, go right ahead. Otherwise, as I say, we'll let you have enough rebuttal time if you want the state to address it first. I'm comfortable addressing it right up front. As we've said, the record itself was given to defense counsel before the trial court held this hearing about the names. And we know when the trial court held up his copy along with defense copies that they were the same. And so this isn't the type of situation, as in the Illinois Supreme Court case of Holmes, where this was material that the trial court reviewed on camera. This was discovery, tendered to defense counsel as relevant, that just the names had been- Was all of the data, including the data that was under seal, approved and released to the parties by the court? It was in the common law record. So it was- I would argue that the names were under seal, but since the information had already been tendered to the party, when the court said it was placing it under seal, but then didn't actually seal it and put it in the record, the implication is that definitely the file in itself should be preserved. What was the- Is it your position that the only thing that was really redacted were three names? It was all of the names in the report had been redacted. Okay, every name in the report had been redacted? Yes, and that's what the trial court said, and it is consistent with how the abused and child- How many names, though, are of any significance here? Three? How many are you talking about in your- Oh, we don't really rely on the names at all. We're looking at the substance of the report. Was any of this material that was sealed presented to the trial court in any argument for any purpose in the trial? I mean, obviously the most relevant purpose would be towards ineffective assistance. Was any presentation made or any argument made to the court from any of this material that it was indicative of ineffective assistance of counsel? And if not, that, was any argument made that it represented data from which a witness could be impeached? And was any witness, in fact, impeached by any of this data at trial? U.S. would have been impeached, but defense counsel did not utilize the report to show her prior inconsistent statement. And that would have been specifically that she told the DCFS that she had had an act of sexual intercourse with the defendant January 2nd? She said that at trial, but she did not say that to the DCFS. Okay, all right, and that's the only comment that you're talking about in terms of that one inconsistency. What else is in the record? What else do you believe he should have, the lawyer should have, used in actually impeaching or attempting to impeach any of the testimony? Oh, well, we, it was to ask about the prior false complaint, and then... But is that in the DCFS? It mentions that there's two individuals who are aware of the prior false complaint. And were they the people at the school, though? Jackson? Yes, it's unclear if defense counsel would have known that they were at the school, but... Now, supposing it was clear that there was no justification under Supreme Court or otherwise to use that evidence, do you still think that an attempt should be made by a defense counsel to assert or interpolate impeachment for impeachment purposes, that which the lawyer knows to be inadmissible? Defense counsel specifically tried to impeach U.S. on her testimony about the subsequent sexual activity. How about, yeah, but that is well enough weight to assign to that impeachment. But if the lawyer would have thought that the prior complaint made by this defendant as important as it may have been in swaying a jury, if there was a jury, should that attempt be made by a lawyer where he knows that it's not admissible? I'm not talking about the prior complaint. I'm talking about the prior inconsistent statement. Well, we're talking about that already. But I thought you're talking about the prior accusation that she had made. That seemed to go nowhere. I think that was more of a failure to impeach, but I'm sorry, I believe that the question was what... But you're not focusing on that. I misunderstood your question. I'm sorry. I thought that you were, what could he have used? And he could have used that prior inconsistent statement that was admissible at this trial. But as far as the prior complaint is concerned, I don't want it to be understood that a defense counsel has a license to inject something like he does in the movies that he knows is inadmissible just for its impact that it's going to have in spite of the rules of the law. It's certainly not a basis for ineffective assistance of counsel. I would agree with Your Honor on that point. And in our opinion, it's the failure to ask about this evidence to determine if it would have been admissible. Ask whom? To ask the trial court who made these statements and then to investigate the circumstances of these statements. And they may have actually shown that it was admissible. But don't you still have to show that prejudice prong in order to get past the ineffective assistance claim? And this was a credibility case where we've argued that the evidence in and of itself was not sufficient. And this was vital credibility. It could have been. But if you don't know what the false complaint is, how can you show the prejudice? That's what I'm trying to understand. My argument is that it's that same neglect that he used in not using the prior inconsistent statement that did not cause him to ask for this important evidence. But you also have to show that based on all the evidence presented that he was prejudiced. And I think any and all evidence relevant to the complainant's credibility at this trial where her credibility mattered so much was ineffective. And it was the same trial where there was clearly a lineup that has not been otherwise contended to have been suggestive that he allowed in to bolster these identifications. Here we don't have an affidavit or any evidence to show what those witnesses would have testified to. For example, the administrators. Wouldn't it be better that if this argument be raised on a post-conviction petition where we had that evidence so we could clearly show that there was some prejudice? Right now we're shooting the dark. My argument would be that these records appear in this case and that we can't release them to the public. So we would ask for a remand here where the court was actually involved unusually in this discovery process. And so that any discrepancies could be resolved through a hearing sort of akin to a Krankel hearing. And this court could address all of our claimed errors, including those that aren't dependent on the DCFS report at one time. And defense counsel could be called to bring in his copy of the record and testify about the investigations that he made. Is this a case of a possible false complaint or is it an identification case? You mean not the prior false complaint? This one. I believe it's both. It's both? Yes. It's primarily a case about a false complaint against Mr. Turner. How can you, I mean I can understand the suggestions you've made about the different if there was something to establish that there had been one. And there's some suggestion in the record that there were two people at the school that believed that there had been a prior complaint that turned out to be false. And then I understand the lineup, that there was no effort made to move to suppress. But I don't understand how you can say a false complaint when you have a 14-year-old and you have an adult, although I guess you would argue that that's questionable whether the person that was there was really an adult or was it a younger man or boy, you know, someone closer in age. But under the, you know, under the evidence, I mean I think the theory of trial was reasonable and that the identification, you know, who the person was is the issue. Not that there was a possibility of a false complaint because you have a younger child saying that she observed an incident. You have another person, not the victim, saying she observed this act. And then don't you have Darlene, in addition, who actually escorts this person out of the house? Yes. So I don't know how you're getting, I don't know how you suggest that that evidence suggests a false complaint. It's just an issue of was the person who actually committed the act the defendant, but not that the act didn't occur. I don't disagree that there was an act. But we don't dispute that. Wasn't there other corroborating evidence other than even the occurrence witnesses? Forgetting about the cards that had the block printing of the name Donnie in it, which you attempt to. And the phone. Which you intend, but it's the giving of the telephone that would be indicative of an adult, of a gift from an adult, wouldn't it? Even if you explain the Donnie as a kind of a forgery or fabrication based on block printing that is easily mimicked. But you do have that. Plus the fact, wasn't there some witness who would see them together? And with the passage of compliments or flattery from the defendant to the young woman here? No. There was no complaining witness. And in my opinion. Well, where did that evidence come from? The fact that she was being, so to speak, seduced with words of endearment and the like. Is that all just in the written cards? Or was there some verbal interchange as well? It's just in the cards. And we would submit that those don't appear to be written by a 36-year-old man. And I think the phone is one of them. Are you suggesting that adults don't use numbers for texting? Instead of saying two, they don't use the number two? I mean, I don't, is that what you're saying? That these were written like, I don't follow that. That's one of our arguments, is that they appear inconsistent. And I think if you look specifically at the cards that she claimed, they're black letters. And they just don't look, they look very childlike. And so, and we say look at all the evidence. And this phone is perhaps the greatest weakness in the state's case. Because U.S. certainly did testify that Mr. Turner gave her that phone. She said that he brought it over to her house one night, at a night when her family members were home, but they didn't see it. She also testified, though, that this Christmas Eve encounter was the very first time they had ever met outside of school. So, he hadn't brought her this phone prior to these events. Her own testimony conflicted on that point. And that was, again, how would this relationship have developed between these two individuals? It's just the only evidence that we have to corroborate. Isn't there some suggestion that the cards were pre, or part of this before the incident? Or no, everything followed from the 25th? She said, she said he dropped all of the cards, or some greeting cards, off that night. And she said the notes were passed in the hall. So, if you don't have the phone, that's the only evidence that you have about any possible relationship that could have led to these events on that night. And I think that that is why the credibility mistakes made in this case were important, and why the evidence is not. Wasn't her testimony, I don't remember whether it was before or after Christmas, and if that's the case, wasn't the finder fact, was he unreasonable in finding, well, I'll take the before, as opposed to her uncertainty about whether it was after. She specifically said that it may have been after. She also said specifically that she did not call him except for that phone. So it may have been something that the trial court overlooked, but there was not discrepancy in the way that she testified to that. After she was confronted about, this was the first time you ever met, how'd you get the phone? She said, I guess it may have been after Christmas, and that's what I told the police. So, the trial court, I mean, I guess the trial court could have inferred that she was mistaken, but that would have been the only way to get around it. So are you arguing that in context of sufficiency of the evidence, or do you want to use that to say, well, when you're looking at the prejudice prone of your ineffective assistance case, how do you want us to look at that? To consider that this was a very weak case. Do you think that arguing ineffective assistance with us is, would be a, would forego the opportunity to argue ineffective assistance as contemplated in the Supreme Court case of Brew and in the subsequent case that cites to it, that those arguments would, to the extent that they refer to matters not complete, not in the record, are best saved for post-conviction petitions and post-conviction proceedings? If you now open up that argument here, have you contemplated the impact on what that may have in terms of, in case you're not, you don't prevail there, to necessarily be able to recommence that argument in a post-conviction petition? That's the very argument that drove us to include it in this brief, because this is where these records were preserved. He won't have access to those records in a post-conviction petition, and that's why we suggested, given the unusual manner, if this court does not find enough evidence in this record of ineffective assistance, that it remain for a critical hearing in this case. And the Williams case does support that even when the defendant has not said, my attorney was ineffective, fundamental fairness does allow this court to drive to get to make sure that this case is solved in this case. Even though there was no such colloquy with the court at the post-trial motion, during the hearings on the post-trial motion or otherwise, before the jurisdiction of the trial court was divested? You still think that you're entitled and we have jurisdiction to go back and remand for a critical hearing? Yes, this court does have jurisdiction. And I think it was the trial court's unusual involvement with the pretrial hearing, where it was seeing all this same evidence that would have allowed the trial court to do that. Although it was before trial and not after trial, the evidence was still before the court, and that's how it is. And I'm happy to answer any questions this court has. Anything else? No. Thank you. Thank you, counselor. Ms. Boland, why don't you start with this suggestion that we send this back for a cranial hearing? What would you respond to that? Well. And in this case, there is no oral complaint to the judge. There was no written motion, no pro se written motion. There was nothing in this record suggesting that the defendant felt he had an ineffective assistance claim within the 30 days after the trial. True? That's true. That's very true. What would you say in response to that? So sending it back for a hearing is to send it back for, essentially, a whole new trial. Let's start over. Let's look at this evidence differently. Let me put on different witnesses. Let me ask different questions. Is it really true, counsel, that getting a cranial hearing would necessarily entail a comprehensive relitigation of the issues, as opposed to simply a determination whether there was ineffective assistance, and the counsel's not raising the prior inconsistent statement, the inconsistency in the failure to disclose the assignation in that hotel room in the early part of January, and possibly also not calling Jackson as a witness, as a technical witness, let's call her, to disparage the prior non-believability of this defendant based on her past conduct, or whatever other criteria she might use. You think that that's going to involve a full-length trial, and that the judge is going to have more than an afternoon that this is going to occupy? Well, there's nothing below. The trial is completed. Now we come here on appeal, and we take a sealed record, and we unilaterally unseal it, and we raise these issues. Let's talk about the sealed record. You're not talking about an excluded record. You're talking about a record placed under seal, but given to counsel. Is that right? No, that's not correct. OK, let's hear about it. So let's talk about that for a minute. I have to say, March is my 15th year as an appellate lawyer, just as an aside, in the Cook County State's Attorney's Office. And this brief was amongst the most challenging. And the reason is that originally a redacted record was sent to defense counsel. The court then required DCFS to provide an unredacted record to the court. The court then held counsel. Is it true that the redaction simply consisted of the omission of names, but not of events? Well, you see, the claim here is ineffective assistance of counsel. Ineffective assistance of counsel requires us to consider what did counsel have during the time of trial. I don't know how this court knows what counsel's redactions were without a record showing what those redactions were. What about the contention that there should have been more fervent inquiry, or that there should have been greater pursuit by counsel to ascertain this information? And so counsel has a redacted record. We don't have the redacted record in the court, which is why all of your questions are, what if this? And what do you think? And what might be there? What we do have is the record from February 13, 2009. What's contained in the common law record of these materials that are under question? What I got in the common law record was two sets of the unredacted DCFS records. Well, then is that part of the record or not for us? The procedure is this. If we get a sealed record, are we prohibited from opening up the seal as a reviewing court? Not at all. So it is a record before us. No, it's not. The record before this court would be the sealed record that was sealed without the parties being able to argue it, without the parties being able to see it. That is what Holmes says. You admit in your brief, as I recall, that counsel would have had the prerogative of being present when these seals were opened during the original in-camera review, isn't that right? Counsel has the right to argue whatever is provided by the trial court, but the counsel was on February 13, 2009. Counsel had a redacted record, and the court said to counsel, the court says, they have given me the unredacted records. I'm reporting from the February 13, 2009 record. They have given me, they being DCFS, the unredacted records and are asking that I not release them without an in-camera inspection. And if I do, they will ask that there be a protective order, and the court provides that. But the protective order, if it's the ordinary kind of order, excludes the parties and their counsel. Exactly. That's the point. And the point is, They're permitted to see it, are they not? No, they're permitted to see what the court transmits to the parties. And so there is a redacted version somewhere. The court does have discretion not to show it to anybody. That's correct. But is that the discretion that the court exercised here? Or did he exercise the discretion of the partial exclusion that it be known to the parties and their attorneys, but excluded from the public view? No. What happens is, when there's a privilege, a confidentiality, some interest asserted in a record, the subpoena goes out, the record is returned to the court, as this court is well aware. The trial court then reviews it in camera. Then it entertains arguments from the parties. Well, I have a redaction here on page 7. Half my- If we can stop, if we can do a little slow motion on this for just a moment. When the court commented, did the court invite or disinvite any of the attorneys from viewing those documents? All of them? Here's what the court says. So somewhere in the redacted version, which is the version initially provided by DCFS to counsel, you believe there are reports of incidents where the witnesses to those incidents had their names blanked out. I need to know what you are talking about, so I can look to determine whether or not it is something I should turn over to you. Now, defense then makes several requests. The court goes through each of those requests. There's a lot of confusion, because apparently the court has 53 pages. Defense counsel has a redacted record that numbers 52 pages. And so as they go through, the court keeps saying to counsel, let me see your copy. Or counsel offers his copy, because they can't quite figure out what they're each talking about. So clearly, they're looking at two different records. Counsel's redacted record is not the same as the court's record. Well, it's not going to be much shorter, because it's just the omission of names. No, it's not just the omission of names. For example, and that's the point. So let me finish my first point before I get back to this. The first point is, when the trial court seals the file and a party wishes to make an appeal, the process is to take that sealed file and ask the appellate court to allow it to be filed under seal and then make whatever arguments you wish to make. And the appellate court, just like the trial court, certainly, as you've said, can unseal that, look at it, and determine whether the parties can make their arguments or whether those arguments. But it didn't come here that way. It did not come here that way. Counsel simply took what the trial court said I'm going to seal in my record, put it in, maybe had the clerk certify it as part of the common law record, made all their arguments on it. But aren't you building more of a case of ineffective assistance and not having done that? I'm not, because I'm not getting to the merits yet. What I'm saying to this court is. Except you're expecting it to appellate counsel or whatever. Well, appellate counsel did this, because obviously, the trial counsel did not. The record, the common law record is prepared for purposes of appeal. Now, why appellate counsel did this, I don't know. I'm not ascribing some nefarious motive. I'm saying that somehow the process opened records that were clearly redacted to trial counsel. The process when you have a sealed record is to say. Your complaint is a little more vigorous than your brief. Perhaps reflected my frustration that in 15 years, I've never tried to respond to an argument that I can't figure out what we're exactly responding to. You see, the argument isn't that the trial court made an error. The trial court didn't give me my in-camera inspection. The trial court made these errors. In which case, the appellate court can say, trial court, you need to look at this. Or trial court, you need to hold an in-camera inspection. That is what happens in the majority of cases. This is not that argument. This argument is ineffective assistance of counsel. And the standard for ineffective assistance of counsel is to say, what did trial counsel know at the time of trial? So to figure that out. Well, it's not just that. At least if I hear your opponent correctly, and I think I did. And there's some echo of it in some aspect of the law. It's not just what he had, but what he failed to get. And the reason that this whole argument is being made here is because a redacted record was unilaterally opened, provided to this court as part of the arguments, as if, in fact, it was all discussed and available to trial counsel. And trial counsel failed to explain intention. But the contention of your opponent is more, as I hear it, more cautiously drawn. Your opponent is saying that there should have been greater and more intensive investigation. That counsel's curiosity, in terms of his legal, in terms of his duty to his client, should have been provoked to the extent of pursuing more information. So if I were to give you a blank page, and I said, counsel should have, on the basis of this page, done X, Y, and Z. You're not going to use me as your foil in this. Counsel had more than a blank page. He had a statement that possibly there had been a prior complaint, first of all. And secondly, there had been some information that was given that naturally would have been disclosed at an interview earlier. But he didn't have the names. But you have to look at the, what you have to look at is the February 13, 2009 transcript. Because you see, now that the door has been opened, now that we've all looked through this file, we're now arguing what counsel knew or didn't know. What we don't have is what counsel knew or didn't know. Let me ask you this, counsel, as perhaps a way of bottom lining this argument. Will counsel, will the defendant, as far as you're concerned, have the opportunity of making this argument and opening those files in a post-conviction proceeding if it doesn't succeed here? Or do you think that that avenue was forever barred? Well, to the extent that counsel is trying to make arguments about witnesses that were never presented, and we don't know, what we do know from the record is that Beverly Jackson's name was given to defense counsel. And the purpose for which Beverly Jackson is claimed to be important is both on the bipolar issue and the fact that she doesn't believe the victim. Well, it's mixed, right? The two are not unrelated. Well, but the point is, that's what she's saying. The bipolar issue was already explored. That's the point. And I don't know that a witness can ever say, I don't think she's believable. That's the point. The point is that what we know counsel knew is in the February 13, 2009 record. We know that counsel wanted the names of witnesses, and he got Renee's name. Renee was apparently another foster child that slept through the whole thing. So she ended up not being a witness. I'm not sure that I am of the same categorical position that a witness is never believable in testifying credibility. At least the witness would be believable if there is some syndrome, as I've indicated, like narcotics addiction, maybe profound alcoholism, maybe certain kinds of brain damage for which medical or technical testimony would be available. And the thing to be explored is we know, for example, that in the area of mental health, the law hasn't quite caught up with the requirement that there be professional testimony, that an expert be qualified in every aspect of mental health. So the question remains open, I suppose, whether a social worker who seems to straddle some of the functions of a therapist, for example, would have the requisite qualification of a witness who could testify to mental conditions that impede credibility, as opposed to character that impedes credibility. Well, you know, on that point, I cited the Becker case. And in the Becker case, there was an offer for the Illinois Supreme Court case from 2010. And the mental health expert was going to sit in and testify as to whether the child was testifying accurately based on whatever mental health issues.  Obviously, it's a very closely guarded area, because expanding it will usurp the function of the trier effect or the jury, so that you don't want every Tom, Dick, and Harry to be able to testify to someone's truth-telling abilities. But we're talking about the possibility. We don't have a casual situation here. We have a bipolar youth, some misbehavior in the past, which is in itself not admissible, but which may be a basis that is still usable by a psychiatrist, if you were to testify, that this is a person who is incapable of telling the truth or what have you. And I'm only, this is, I want to say, this is only a mere speculation. But I wouldn't categorically foreclose that possibility. Well, I would simply say that the Becker case pretty clearly says that one witness cannot go around commenting on the credibility of another. That's understood. We certainly understand that there are experts that can testify. Under certain conditions and circumstances, other than simply person-to-person evaluation. We all know in our private lives that we say somebody is a liar, somebody is telling the truth. But obviously, the people who should do that in a court proceeding are the triers of fact, namely the jury and the judge. Sure. And so when you get into the issue of just being a credibility point, the court's already noted. Brainerd was in the room. She hid because she was scared. She knew he was a teacher. She knew him as a teacher. And that's why she got behind the bed and she was scared. And Asia came up. She didn't know who this guy was. He's a small guy. If you look at the record, he's about 5 foot 7, maybe 129 pounds. He's not very big. So she's calling him a boy. She sees his head between the victim's legs. She goes and gets Darlene. Brainerd considers it her opportunity to get out of the room. She follows Asia down the stairs. Darlene sees him. Everybody escorts him out of the house. This is not just about this kid. There are letters. The letters talk about the individual being a deep and intelligent man. Talk about her being a princess and he wants to make her his wifey. The letters have the name Donny. There are certain anomalies in this case. I'm not at all saying that they rise to the level of making the whole circumstance incredulous. But we do have what is a 36-year-old educated person invading a 14-year-old's domicile on Christmas Eve with family presumably present to basically self-immolate. That's not terribly common or terribly plausible. But it's not necessarily, as a matter of law, incredulous because these things are known to happen. They are known to happen. And there was ample evidence that they occurred in this case. I'd make a couple of comments beyond the record. I'll let the court look carefully at my arguments with regard to the record. I think that I've made those arguments very clearly. I think that there's a process for this, that this is not the process. This invites the court to speculate. And your question to me as to whether there's post-conviction to the extent that there are matters outside the record, the Illinois Supreme Court has said, when you don't develop the record in the trial court, but you have these claims, a claim that some witness should have been testifying or there's some information, you can make those claims. We have a process for that. It's called the Post-Conviction Hearing Act. With regard to the prior inconsistency amendment, I would just point out to the court that the cross-examination with regard to the hotel trip, it actually did come out that the victim said she told the police, but she also admitted she didn't tell her mom. So to the extent that it was that she didn't tell somebody around the time, or Patricia, who was her foster mom, so to the extent that she didn't tell someone that came out in the record, that was before the trial court in this bench trial. With regard to the motive to lie, I think the court has made it very clear that Cookson requires certain elements if you're going to get around this general reputation point. There has to be a specific threshold indication. I think the court has pointed out what we have is two. The scenario that the defense draws in this case is that because of the prior false complaint, or more than that, I suppose, because of the fact that she is in a foster home with a foster parent who is ill, and evidently the place that the defendant put that place value on, that she might be better off charging an adult teacher than she would be admitting to indiscretions with the peer. Well, I would point this court to Cookson again. Cookson's an Illinois Supreme Court case. If you recall the facts in Cookson, it was a little girl, a seven-year-old, who had a mom's boyfriend. Stepfather. Stepfather was the mom's boyfriend, was the live-in stepfather, if you will. And so she made the claim against Cookson. Well, for a period of time, it turns out a DNA test showed that someone named Aston was her real father. She spent some time living in Aston's home. She also made an allegation against Aston. These were very graphic allegations. Aston was apparently mom's pimp. So the child made very graphic allegations. At some point, Aston's case was indicated that it was unfounded by DCFS. The issue was whether that unfounded indication would impeach her credibility, show her to be either confused or lying for some reason against Cookson. And the Illinois Supreme Court said, it's not admissible. It's not coming in because it's unrelated. Whether she was abused or not by Aston has nothing to do with creating a motive against Cookson. And even in that case, the argument was, well, she doesn't want to live. She doesn't want to go back home, which is basically the argument here, that somehow her living situation is really the root of this motive. And the Cookson court said, that's not enough. Would make a little more impact if the first accusation was true, that she would want to avoid the blame of placing the experience that was witnessed in her bedroom on Christmas Eve on an adult rather than on a peer. That would make some sense to that. But I'm tossing this softball to you. I want a response on that in rebuttal. On the other hand, how the false prior accusation gives her motive to shift the blame to an innocent adult, I don't fully comprehend yet. That's the point. The point is that this is confidentiality, materiality, relevance, admissibility. All those questions are trial court questions, and that is why we spend this time trying to speculate and imagine, well, if the evidence was X, and if there was a witness Y, then maybe Z could occur. Or if it wasn't Z, maybe there's a letter out there that was written by someone else. That's not the purpose of this court. That is not the purpose of this appeal. There are processes for this. This is not the process, and that is why this court has to spend so much time speculating down the road, because we don't have the record that actually states the elements that the Supreme Court in Cookson says are the elements. And Cookson's pretty close to being on point, where there's some sort of prior allegation. It is unfounded. And Cookson says, it doesn't come in. It does not. Even if you agree that this occurred and that this occurred falsely, it doesn't show a motive for this individual. And we have way more than Cookson. In Cookson, it was just a little seven-year-old. Here we have all kinds of witnesses that saw this. Brainy knew him. She knew him from school. She was scared of him. This is not someone who just felt sorry for US and years later showed up at court. Darlene had no idea who this guy was. And she didn't see a sex act. She's not in on a conspiracy. She didn't say, oh, I saw it, and this is what happened. Again, we're not speculating. The facts are the facts. There were several kids in this home. They saw this. Darlene, the oldest, who took on that responsibility, she didn't even live there. She just went for the holiday. But her foster mom is sick, so she takes the responsibility of being the responsible adult at 18 years old. And she goes up to the strange man in the house, and she escorts him out the door. We did read the briefs. Yes, exactly. So my point is, all this speculation about maybe if, what, have, could have, should have, none of that is relevant to this appeal. And I think if the court looks at the record and determines what is in this record, it will affirm the trial court's decision. Thank you. Thank you, Your Honor. Will five minutes be enough for you? Thank you. I guess the first question I would like to make is the implication that I went to the trial court files and picked out sealed records. That's absolutely not true. The trial court preserved these records, and the clerk preserved them in the common law record. But didn't the trial court specifically seal the unredacted version of the reports? It's unclear. He said on orally statement, I am sealing these and placing them in the record. They will be kept in the record for appeal. And there was this whole colloquy where he said, do you have the redacted or unredacted, and I'm giving you the redacted. The defense counsel had it first. The trial court said, we can have a hearing. Those times when they would have confusion over the 53 versus 52, the trial court would hold both of them in his hands, and his quote is, well, you have the same report that I am looking at, just that they don't identify the name. That's exactly consistent with what the statute, the Abused Child and Neglected Reporting Act, says that criminal individuals charged with an offense based on investigation from a DCFS are entitled to. So we can be very certain that what we knew from defense counsel. And if you look at the questions that he was asking, he was saying things like, who was the person on this page that said, DOS said that, da, da, da. He was clearly referencing the same pages. It was the names that were redacted. And in my opinion, when I looked at the transcript and saw sealed, since the information had already been released, that the sealed information certainly was the names of the witnesses. That's certainly information. And to the extent that I made a mistake on that, it was a mistake. But were those names part of the record to enable a reviewing court to make a decision based on exposure of those names at trial? I think I misunderstand the question. Well, do we have enough? We do not hear evidence as a rule. There are some exceptions to that, but very rare and very few exceptions. So our decisions are based on a frozen record as it comes to us from the court below. Now, if you have names that were in the seal that you exposed after trial and are now presuming to argue the presence of those names and its implication to us, can we properly hear that? And the point that I'm leading to, or should we defer to people versus Leiden and people versus Breaux and tell you, as the Supreme Court did, that that is more appropriate for post-conviction proceedings rather than direct review? Well, we haven't relied on the names as part of the basis. We are truly relying on what this record shows the defense counsel had. The complaint, it's the relevance, the substance of that document that we're relying on. Not the names. Correct. And I think it is proper in this case, instead of a post-conviction petition, for the reason that this was preserved for this record, according to the trial court. If you look at the transcript, he says I'm preserving this for the record. It's not going to be limited outside of this case. His protective order says to be used by the parties for this case and this case only. This is the time for it to occur. And if there's questions about what defense counsel had and questions about did he investigate these, it's an unusual case. And that's why we would ask for the evidentiary hearing in this case. Is there anything else? Thank you. This case was well argued and well briefed and will be taken under a trial. I should also say, passionately argued.